Between the same parties. Do we have the lawyers here? Usually they're dashing up to the front. We have Case No. 13-3587, Premium Balloon Accessories v. Creative Balloons in Category B. Royal Argument not to exceed 15 minutes per side. We have Case No. 13-4049 and 13-4130, Premium Balloon Accessories v. Creative Balloons in Category B. Royal Argument not to exceed 15 minutes per side. Let me lay out for you how we'd like to handle it if it doesn't disaccommodate you. It seems that we have, fundamentally, Premium's claims against Creative on the trade dress, where Premium prevailed to a certain degree, got a certain amount of damages. Creative says that you shouldn't prevail at all, or if you did, you shouldn't get as much money. Premium says we should have gotten even more money. So can we handle those claims that way as appeal, cross appeal, and then we'll worry about the balloon ceiling attorney's fees separate after we go through that back and forth. Does that seem plausible? Can we add the licensing agreement as part of the trade dress? Is that what I called the balloon? Yes, the 1999 settlement agreement. Oh yeah, no, that comes into that. I just said that the part about the balloon ceiling is different. The way it's called, some of the price erosion claims are allegedly in the second one, and I want to get all the money and liability having to do with the trade dress in the first round. So the appellant, Creative, you think there shouldn't have been any damages, or if there were, there should be less. So you start off with the appeal. We'll hear their side. And on your side, if you want any rebuttal time on your cross appeal, then it's going to be limited strictly to your cross appeal part. Okay? For wanting more money. Okay, go ahead. And we'll try to be flexible on the time if the arguments warrant. May it please the Court. My name is Jude Fry, and I am here today on behalf of the appellant, Creative, Balloons Manufacturing. I have reserved five minutes for rebuttal. This case is about the protectability and infringement of unregistered trade dress in a heavyweight star-shaped balloon weight. And this star-shaped balloon weight is sold in connection with helium balloons, particularly helium balloons decorated with stars, and acts as a counterweight to the helium so that the balloon is anchored. The District Court granted summary judgment in Premium Balloon Accessories, who I'm going to refer to as PBA. Summary judgment in PBA's favor and found that the product configuration, trade dress in a star shape, was protectable and issued a permanent injunction against Creative. By its ruling, the District Court granted to PBA a perpetual monopoly in a commonplace generic star shape using the Lanham Act. Now, PBA has not asserted that it owns a patent on the star shape, and PBA does not assert here that it owns any copyright registrations on the star shape. It is the province of the copyright law and patent law to prevent copying of products, and those laws, unlike the ruling by the District Court, provide only a limited time of exclusivity, whereas the finding by the District Court would give Premium a perpetual monopoly. Now, it's not surprising that PBA does not own patent or copyright protection on this star balloon weight. There are photographs of this star depicted in the briefing, and the star product looks like any other generic star shape. It has ten sides of equal length. It has five pointed parts coming out from the center. The pointed parts are the same size. The shape is symmetrical. And in the balloon industry, balloons are decorated with stars, so the weights are star shaped so that they can be sold as a match or a complement to the star balloons. This star of PBA's is not unique. It's not distinctive or arbitrary or fanciful in shape. It's a commonplace star regarded by the public as a laudatory symbol demonstrating quality, rank, or achievement. Am I right that in terms of this star as opposed to the one that had been made earlier and that clearly was included in the previous settlement, the difference is that it's thicker and therefore heavier? That's correct. Is that essentially it? Yes. That's the main difference. There are some minor ones as far as the loop has to be bigger to be able to tie on bouquets of balloons. But for the most part, that is the difference. This star as well was marked with the Superstar Trademark of Creative, which is a registered trademark with the U.S. Patent and Trademark Office. So it differs in that respect as well from the 8-gram balloon weight that was the subject of the 1999 agreement. With respect to the other parts of the settlement agreement where it says that the quality of the products made by Creative is at least consistent with the quality of the products presently being made by Creative, would that have satisfied that part of the settlement agreement? I'm not sure I'm following. Well, you had a settlement agreement where you got a license to make stars, saying such license to continue so long as the quality of the products made by Creative is at least consistent with the quality of the products presently being made. Is there any question that the quality wasn't similar? No, none at all. In fact, there's no evidence in the record that the thicker balloon weight was of less quality than the 8-gram. Then the agreement goes on to say, and provided that the appearance is not modified to be closer in appearance to the corresponding product. So is that also satisfied that you didn't modify it in some way to make it look even more like theirs? We would say it is, Your Honor, because we marked it with the superstar trademark, which is a registered trademark of Creative. So you weren't trying to pass it off as their products? No, absolutely not. The star shape is also marked with our house mark on the back, and the children carrying the balloon logo. PBS Star is nothing more than the basic form of the star shape. It's generic, and it's unprotectable. No designer should have a monopoly on designs regarded by the public as the basic form of a particular item, and that law comes from this Court's case in Abercrombie. So it's our position, Your Honors, that that star shape is generic, and it's also our position that that star shape is functional. Could I just ask you, in terms of the argument that the star shape is generic, do we just employ a sort of common sense observation of that, or is there evidence to that effect? How do you persuade us that it's generic? Well, it's generic. We submitted as part of our record different star shapes made by other manufacturers to be sold in connection with balloons, and it's generic because it's just a star shape, and it's the basic form of a star, and it's our opinion that based on the industry here and common sense, frankly, you see stars everywhere. This looks like a star, and really that's why we're saying it's generic. Is there any evidence from their side that their star had acquired secondary meaning? They say there is, Your Honor, and let me go through then very briefly what that evidence is. They do not have any consumer survey evidence. There is one declaration from one of their customers. They say they have about 50. They have one declaration from a customer. This customer was not disclosed during fact discovery, and we did ask the court to strike that declaration. That request was denied. This customer filled in a form declaration and signed it and said, customers recognize this star as emanating from premium. I thought that that declaration didn't even say the customers said I want a PBA star. It seems to be phrased a little more obliquely saying they asked for and then they filled in the technical specifications of the PBA star. Right. You're right. You're correct, Your Honor. Now, are those technical specifications, to find out whether that really makes any difference, are those technical specifications for the heavyweight PBA star any different than the technical specifications for the heavyweight creative star? Well, we would argue they are because part of those technical specifications is the overall appearance of the star and their star. It doesn't speak to overall appearance. I think it says the appearance in there. It says they asked for a star of certain weight or something. And I think they have a listing, and part of that says appearance. I believe, Your Honor, it does say appearance or configuration. And ours is different from the standpoint that we do not have a bouquet strap on our star. That's the big difference there between the two products. And that bouquet strap is functional in that you put it on there so you can lay the weight flat on a table and then tie the balloons. So you're saying yours does not have a strap and theirs does? That's correct. Okay, go ahead. So going through the evidence of acquired distinctiveness, the amount and manner of advertising, they did not give us any evidence of advertising expenditures. That's not a record. The affidavit doesn't speak to the bouquet strap. It just says requested by U.S. Balloon customers by description, including the features making up its overall appearance, such as size. Your size is the same, isn't it? It's heavier. Weight or mass? Yours is heavier? Yes, ours is heavier. Configuration, whatever that means. Well, configuration to me would be the overall appearance, which would include the bouquet strap. And then material, i.e., smooth plastic, yours is the same there? Ours is plastic. Colors, which is the same, right? And I'm sorry, what's the weight? Colors. Colors, yes. Colors are the same? Yes. But you did say that yours is your heavy one is even heavier than their heavy one? Correct. It's 100 grams. And theirs is? I think it's 80. 80 or 90, I can't remember. Okay. Counsel, if you want to save your rebuttal on this round, your time's expired. Okay. Thank you. Good morning, Your Honors. Ray Weber on behalf of Premium Balloon. Just to make short work of the bouquet strap, it's in evidence. And here's our product. Here's their product. There's no bouquet strap on this product. There are bouquet straps on some of them, not all of them. We have trade dress in the appearance of this product, trade dress that is as to the size, shape, weight, configuration, primary colors, texture. This isn't the first time we've been involved in litigation with these people. And you settled the previous litigation saying that they would be able to make stars. No, no. The trade dress that was at issue in that litigation and the trade dress that was in that litigation was very specifically defined. There were four types in there. There was a teddy bear, a heart, a smile face, and whatever. They were eight-gram weights. There were two heavy weights. We settled on the trade dress that was in that case. When you read the complaint that was settled by that settlement agreement, the complaint talks about the size, shape, configuration, colors. It says it expressly, and it's in our briefs, and it's presented expressly in our briefs. Well, does the settlement agreement, though, say that? Doesn't the settlement agreement say the trade dress that was the subject of the complaint, namely star, smiley face, heart, and teddy bear? It says the trade dress that was the subject of the complaint. Then it says the complaint. Well, right, and it's saying, and it was in these four configurations. But what was at issue in the complaint, the trade dress in the complaint, was specifically defined as being more than just a star, a teddy bear. We would stipulate that it would be extremely difficult to get trade dress in all stars, in all teddy bears, in all hearts. That isn't what we had. What we have is somebody who knocks us off. They wait until we've sold 7 million of these, 7 million over a 10-year period, where Mr. Isaacson, his declaration said, people came in and they did ask for that star by its description, and he said the people knew that. Is Mr. Isaacson the customer declaration that we were at issue earlier? That is correct, Your Honor. That is correct. But am I right that the difference between the stars that were being argued about earlier and the heavyweight star is simply it is thicker and therefore heavier? Well, it's not heavier just because it's thicker. There are other things that make it heavier. Different materials than the previous one? Yes, exactly. There are different materials. In fact, this is a combination of materials that gives it its weight. But your earlier complaint wasn't premised on the fact that it was the same or different material, was it? No, that's right, and that's what makes this different. They didn't have a license. I'm just trying to figure out, if you get a license for something that looks exactly like your star weight, which seems to me what happened in the year 2000, and then you simply make it a little thicker, I'm trying to figure out why isn't that within the license? Because it is the combination. These stars are different. They serve different purposes. They go to different uses. Right now the green one is the less heavy one and the red one is the heavier one. Right, and if you wanted to make this as heavy as that, it would be a lot bigger than this. This is a different weight. It was expressly stated, and they had an attorney when we negotiated that settlement agreement, it was expressly negotiated that it was the trade dress that was at issue and there were six items that were at issue in that case. There were only two heavy weights at issue. The star did not exist at that time, and in fact the star came out right after that suit because we wanted to develop a trade dress in something that would clearly distinguish us from them. You're saying the star didn't exist or the heavy weight? The heavy weight star. Because obviously the license covers a star. It covers the 8-gram star. Where does it say in the settlement agreement that the star is limited by its weight? It's the trade dress at issue in the 1999 complaint. When you read the complaint, and we've pulled out the portions in our brief, the complaint specifically makes it clear that we're talking about the trade dress of the lighter weights, and that's the reason we went to a star afterwards to say we want something that distinguishes us from them. You say went to a star, you already had stars. No, we went to a heavy weight star. We already had two heavy weights in the earlier case, and they had a license to that. They did not have a license to a heavy weight star because we didn't have a heavy weight star. Tell me what there is that says that the heavier star, as opposed to the lighter star or any other star, has acquired secondary meaning or is not functional. Well, first of all, the design of this star, or the design of this weight, does nothing to hold the balloon down. So it's not functional. A teddy bear, a giraffe, whatever you want will hold it down as well. So the design is not functional, and that's what you look at. And I apologize, I don't remember the second part. The first part was that it had secondary meaning. Oh, secondary meaning. Ten years of exclusive use of this mark, of this trade dress, selling 7 million of the product. That is classic acquisition of secondary meaning. Simply because you have been selling them? That's certainly, you know, first of all, people have rocks, and they sell rocks, and they're very successful at selling rocks. That doesn't mean there's secondary meaning in their rock. And I agree with you, and we addressed all of those issues in the brief. You know, we have the testimony that customers recognized it, and they recognized it as coming from a single source. We got ten years of exclusive use, selling 7 million of these units in that period of time. We have, our advertising shows this. You don't do any advertising. Yes, we do. We do advertising, and our distributors do advertising. The only advertising that's even mentioned in these briefs, unless I just missed it, is that which is done by the distributor to whom you sell it. And that is of our product. You don't have to know this. I get that. You don't have to know the source. I get that somebody does advertising. But where do you do advertising? We do advertising as well. You didn't tell us that. It's not in here. Okay, and it doesn't have to be in there, and you can disregard it, because the product itself is prominently advertised. When you've got ten years of exclusive use of a product, there's a reason they came out and copied it. This wasn't just happenstance. Of all the designs that they could have chosen, they came out and copied ours. The basic problem is that copying is, generally speaking, permitted. That's true. So you can copy unless something has developed a secondary meaning. The fact that you sell a lot of them doesn't mean that the consumer identifies what they're buying with you, as opposed to they need a balloon weight that makes the balloon not float. That's one element. That's one element of acquisition of secondary meaning. How long did you have exclusive use? How many sales did you make? That's another element of it. Do we have an established place in the marketplace? You're absolutely certain we have an established place in the marketplace. We presented evidence from three of the four largest distributors of these products in the United States, all of whom distribute this product. To suggest that you don't have secondary meaning, the patent office or the trademark office will grant you proof of secondary meaning after five years of use. You didn't ask for that from the trademark office? No, because 15 U.S.C. 1125A provides for these rights. This doesn't have to be registered. Do you want to say anything about your price erosion? Yes, absolutely. I want to say something about that. We presented 10 years of sales data, 10 years of sales data of our three largest customers that represent 80% of our sales. From that sales data, we developed charts that show how the prices were maintained and how the prices grew over time without interruption under all kinds of market conditions. It was nothing more than plotting data, something that a high school student could do. It didn't require a technical expert. It didn't require a damages expert or an economist. Very, very basic. You see how steady that was for all three of those suppliers for 80% of our 7 million units in sales. It here is the amount of sales or the prices that they charged, or is it the prices you charged? It's the prices that we charged. That's the money we lost as well. But that's within your choice, I suppose. So you're saying that at some point you had to cut your prices? Absolutely. And when you look at the chart, you see it. You see dramatic change in price at the time that they came out with their product. But they say that they were charging a higher price than you were at the time. So why do you have to cut your price to compete with a higher price product? Because we don't know what their price is. We have a one supplier market for this product for 10 years. One supplier being you? Being us. You sell it to the three distributors that distribute the vast majority of it, right? That's right. So we are selling this alone. Nobody else is supplying this product. And so we're getting the price that we want. It's acquired, secondary meaning. People are asking for it. People want this. They're asking for it by design. And then, all of a sudden, they come out. It's common sense that when somebody new comes to the market, what do they do to get market share? They'll typically drop the price. So they'll come in with a lowball price. We didn't know what their price was. But Mr. Nelson, you know what? That's a little odd in the sense that you would think that distributors, either your distributor is going to say this other guy will supply me or the distributor is going to say we're having trouble selling because somebody else is entering the market. Do you have any testimony of that? What the distributor is saying, Mr. Nelson testified to it, is, David, we can get these cheaper now. We can get these cheaper now. Well, that means you did know what their price was. No, we didn't know what their prices were. And you want to know what? That wasn't even necessarily true. Which is what a distributor tends to say to the supplier, right? Exactly. That's what I'm saying. You can't fault Mr. Nelson for lowering his price when all of a sudden a competitor comes in for the first time in 10 years when he's hearing from his customers that they can get lower prices. The test here is a but-for test. But for the infringement, the price would not have been lowered. And that is classic price erosion. It doesn't make any difference whether Mr. Nelson knew what they were selling, how many they were selling, or whatever. He reacted to their infringement, and he acted in a reasonable and rational manner. He lowered his price to maintain his market share. And then what happens? All of a sudden his customers know that he can sell this at a lower price. And he can't, just because he gets an injunction from Judge Pearson, say, Oh, now your price has gone up. You don't do that with customers. And so you have to grow that price back. And he testified to that, and he testified that it took him five years to get to the price level he was at and then was able to maintain when creative came into the market, and it's going to take him five years to get back again. The but-for test, you know, you can say you need an economist. Counselor, I think your time is up. Okay, I appreciate you. All right. You have your five minutes for rebuttal. Let me just very quickly address the issue of functionality. In his briefing, PBA's whole approach to functionality, which was adopted by the district court, was, Look, there's alternate designs here. You could have made a star that was different than our design. Well, the reason we made the star like we did is because we believed we had a license to use it under that settlement agreement, regardless of size and weight, which are not in that settlement agreement as part of the definition of the trade dress in that namely clause. But, you know, the other issue here, though, is functionality and whether the design is essential to the use or purpose of the article. And this court recently, in the Gronenfeld decision, looked again at the issue of product configuration trade dress infringement. And the plaintiff in that case took the same approach here as PBA and said, Well, there were other pumps out there. You could have made a pump that was more like theirs and less like mine. And the Sixth Circuit said, That's not the test. If you meet the definition of functionality under Inwood, then that's the end of the question. We don't need to look at alternative designs. Now, we believe we met the question of functionality under Inwood because we have a star weight here that weighs a certain amount, depending on the kind of balloons you're going to pair it with. And the star also, the purpose of the article is to match it to balloons that likewise have stars. So they're a match. And that is a functional purpose. It needs to be a star to match to a star balloon. And that's the testimony below. As far as acquired distinctiveness, and, you know, we're hearing again about intentional copying, and there was no intentional copying here. We just went with our 8-gram star and made it thicker. That's why our star looks like it does. If you just, your adversary says their star is not only thicker, I take it they say it's denser, does yours end up with the same thickness? Or if you only made it thicker, it would seem to have to be thicker than theirs, if he's correct? I'm not sure if the thickness is identical when you compare them star to star. But the surface area of our star is the same as the 8-gram. You can stack one on top of the other. It's just thicker to be heavier. And then I'd like to say something about the whole issue of price erosion damages here. Our list prices were actually higher than theirs, and that's the evidence. And there's no evidence. How was that evidence submitted? By price lists or something? By price lists. And our client testified at the damages hearing. And there was no evidence that Creative ever sent price quotations to these three anonymous customers who supposedly demanded that PBA cut prices because of Creative. I'm sorry, just so I'm clear, when you say the three customers, these are not the three distributors. They're three distributors who, they're anonymous because He keeps talking about Mr. Nelson. Isn't Mr. Nelson one of the three? No, Mr. Nelson is the owner or president of PBA. Oh, I see. He's saying what somebody else anonymously said to him. Exactly. So the only testimony we have on that, that these distributors demanded price cuts, was coming from Mr. Nelson. There is no documentary evidence from these customers saying, hey, cut your prices. And, in fact, in a deposition, Mr. Nelson testified about the severe price gouging that was going on. And there's never been any documentary evidence to back that up. And as far as their expert on damages, they say, oh, a high schooler could just take our numbers and do the math. But, you know, as the court found, those price erosion calculations were inadequate for just a simple reason, that they failed to take into account the economic principle of elasticity of demand, which means that if you have a higher price, you're going to have decreased sales. And the court found there were a lot of other factors in the record that could have influenced their pricing, including flat demand, the lower pricing they offered to balloon manufacturers, a worldwide helium shortage, which started in about 2008. And so there's just no evidence of causation here. And the law is that to be entitled to actual damages, the plaintiff must prove that some damages were the certain result of the wrong. And that just didn't happen here. Thank you, counsel. Let me just ask my colleagues, do you have anything else you want on the price, et cetera? Okay. Can we go on to the balloons?